In the District Court of the United States
For The District of South Carolina
BEAUFORT DIVISION

RECEIVED
USDC CLERK, CHARLESTON, SC

2007 NOV 30 P 12: 14

CAROLYN N. DEAN,                    )
                                    )    Civil Action No. 9:06-3431-GRA-GCK
                Plaintiff,          )
                                    )
        vs.                         )
                                    )    **REPORT AND RECOMMENDATION**
MICHAEL J. ASTRUE,                  )    **OF THE MAGISTRATE JUDGE**
Commissioner of Social Security[1], )
                                    )
                Defendant.          )
_____ )

## I. INTRODUCTION

This case is before the Court pursuant to Local Civil Rule 83.VII.02(A), D.S.C.,

concerning the disposition of Social Security cases in this District, and Title 28, United States

Code, Section 636(c). The plaintiff, Carolyn N. Dean (the "Plaintiff" or "Claimant"), brought

this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended, 42

U.S.C. § 405(g), and 42 U.S.C. § 1383(c)(3), to obtain judicial review of a final decision of the

Commissioner of Social Security denying Plaintiff's claims for Social Security Disability

insurance benefits ("DIB") and Supplemental Security Income benefits ("SSI") under Titles II

and XVI of the Social Security Act, respectively.[2]

---

[1]    On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted for Commissioner Jo Anne B. Barnhart as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]    The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program, established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides Disability Insurance Benefits ("DIB") to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program ("SSI"), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R.

## II.  BACKGROUND TO CLAIM

Plaintiff was born on January 8, 1951, and was 50 years old at the time she alleged disability, as of March 16, 2001, due to degenerative disc disease, osteoarthritis, sleep apnea, dizziness, vertigo, Hepatitis B, stomach ulcers, gastroesophageal reflux disease ("GERD"), abnormal menses, allergic rhinitis, edema, abdominal pain, and depression (Tr. 73, 94, 104, 132, 134, 156-57, 352).  Plaintiff has a high school education and has worked in the past primarily as a cashier, a manufacturing technician, a secretary, and a food service coordinator (Tr. 105, 113-20, 292-94).

## III.  FACTS

### A.  Documentary Evidence Before the ALJ

Dr. Deborah J. Grate of Saluda Family Practice has been Plaintiff's primary care physician since 1987 (Tr. 349).  In records from August 1999, Dr. Grate treated Plaintiff for sinusitis and joint pain and prescribed Amoxicillin 875 mg. and an SGOT test was ordered time to check the status of her Hepatitis B (Tr. 236).  Plaintiff returned in October 1999 complaining of chest pain with activity, knee and lower back pain, heartburn and indigestion, and rectal bleeding from hemorrhoids (Tr.236).  Dr. Grate prescribed Magsol for arthritis pain, and Prilosec and Citracel, and instructed Plaintiff to continue using Preparation H (Tr. 235)  In November, Plaintiff's stomach and hemorrhoid complaints were improving but her episodes of depression had increased and Dr. Grate started her on samples of Prozac for premenstrual syndrome, assessed her with GERD and constipation, and emphasized the importance of taking Citracel on a regular basis (Tr. 235).

---

pt. 404 (DIB); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical.  *See Bowen v. City of New York*, 476 U.S. 467, 469-470 (1986).

On December 21 and 27, 1999 Plaintiff saw Dr. Grate for acute sinusitis and frontal headache and was prescribed Cefzil 250mg and Prozac for her continued depression (Tr. 234)  In January 2000, in a follow up examination, Dr. Grate noted that Plaintiff's premenstrual syndrome was responding to Prozac as Plaintiff was doing much better and was less irritable. Dr. Grate continued the Prozac and prescribed Prilosec for her GERD (Tr. 233).

On April 25, 2000, Plaintiff followed-up with Dr. Grate complaining of weakness in her left arm and pain in her shoulder area, and hemorrhoid problems when lifting 25 or more pounds continuously throughout the day.  Dr. Grate noted that Plaintiff's usual work assignment did not require lifting.  Although Plaintiff was concerned about her weight loss, Dr. Grate noted her weight was up 2 pounds.  C-spine films were requested so she could avoid lifting greater than 10 pounds repetitively because it led to shoulder pain and hemorrhoid pain (Tr. 231)

On July 31, 2000, Plaintiff presented to Dr. Grate for follow-up to her premenstrual syndrome, depression, and alcohol abuse.  Plaintiff reported she had stopped taking her Prozac because it made her drowsy.  Dr. Grate assessed depression and pre-menstrual syndrome and started Plaintiff on Zoloft and noted a referral would be needed to AA and Al-Anon as she became more responsive to the antidepressant (Tr. 230).

In November 2000, Plaintiff presented to Dr. Grate for her annual physical.  Dr. Grate noted that Plaintiff's crying episodes had returned and her anger had increased.  Her cholesterol level was up to 210.  Dr. Grate assessed hemorrhoids, constipation, left knee pain, depression, and alcohol abuse (Tr. 227-228).

Plaintiff presented to Dr. Grate on January 8, 2001 complaining of back pain that radiates around the rib cage, pelvic pain, and knee pain; Plaintiff had been taking MaxAl and it had been relieving her symptoms of back pain.  Dr. Grate continued Plaintiff on MaxAl (Tr. 227).

On March 12, 2001, Dr. Grate evaluated Plaintiff for short term disability and eligibility under the Family and Medical Leave Act (Tr. 226). According to Dr. Grate, Plaintiff took the note with the lifting restrictions to work but her employer had been unable to find a current job for her and recommended that she take disability while they search for a job. The C-Spine films were reviewed and showed osteoarthritis with some encroachment at the C-5, 6, and 7 level. Dr. Grate diagnosed osteoarthritis and hemorrhoids and recommended an MRI of the cervical spine and x-rays of her knee (Tr. 226). She stated that Plaintiff could not perform her job as a manufacturing technician, but could perform "alternate work" not requiring lifting of more than ten pounds (Tr. 168). She further stated that, while Plaintiff was "unable to do all the duties of her present job," she could return to work when her employer found her a new job assignment (Tr. 169-72).

On March 13, 2001, an MRI of Plaintiff's cervical spine showed mild diffuse disc bulging at C4-5. It also showed diffuse disc bulging at C5-6 which flattened the anterior aspect of the cord with "significant spinal stenosis" (Tr. 224-25).

On a disability claim form dated March 16, 2001 (Tr. 160), Dr. Grate diagnosed Plaintiff with spinal compression C5-6, and C6-7 and hemorrhoids, beginning on April 25, 2000 (Tr. 161). Dr. Grate stated that Plaintiff could not lift or carry more than 10 pounds (Tr. 162) and was "unable to do all the duties of her present job" (Tr. 170) but she could return to work when her employer found a new job assignment for her (Tr. 169).

On March 23, 2001, Plaintiff saw Franklin Epstein, M.D., a neurosurgeon with The Southern Neurological Institute in Aiken, for an evaluation. She complained of neck and bilateral shoulder pain aggravated by a recent change in the requirements of her job. Plaintiff's medications were Magsol, Prilosec, and Zoloft. Dr. Epstein found that Plaintiff had normal

bicipital and brachioradialis reflexes, "minimally depressed" triceps reflexes, full muscle strength, and intact sensation. He noted that her MRI indicated multilevel cervical spondylosis with moderate disc bulging and "mild" spinal stenosis. He advised that she "would be best served with a position at work that would require less strenuous activities, which in turn, provide some pain relief" and prescribed Vioxx as an anti-arthritic medication (Tr. 173-74).

On May 22, 2001, Plaintiff returned to Dr. Grate for a short-term disability follow-up. She presented with complaints of pelvic discomfort, constipation, a sinus headache, and dizziness. Dr. Grate diagnosed vaginitis, sinusitis, and arthritis, and prescribed medications (Tr. 222). Plaintiff saw Dr. Grate again on June 25, 2001 with complaints of right arm pain after she picked up a baby who weighed more than 10 pounds. Dr. Grate found that she had full shoulder range of motion, deltoid strength, and wrist extension. She diagnosed neck and shoulder arthritis and sinusitis and prescribed Zithromax, and continued Plaintiff on work restrictions (Tr. 221).

On September 18, 2001, Hugh Clarke, M.D., a State agency physician, reviewed the medical evidence and evaluated Plaintiff's residual functional capacity. Dr. Clarke found that Plaintiff could perform medium work,[3] as she could lift 50 pounds occasionally, carry 25 pounds frequently, stand and/or walk about 6 hours in an 8 hour day, sit for a total of about 6 hours in an 8 hour day, and had an unlimited ability to push and/or pull. Plaintiff could perform work that required occasional climbing and frequent balancing, stooping, kneeling, crouching, and crawling (Tr. 308-15).

On October 8, 2001, Plaintiff saw Dr. Grate with complaints of increased neck and leg pain, arm weakness, and constipation. Dr. Grate found that she had full shoulder ranges of

---

[3]    "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. §§ 404.1567(c), 416.967(c).

motion, normal strength, pain against resistance in her shoulders, and hyperactive reflexes. She diagnosed spinal cord impingement on a "rule out" basis and scheduled an MRI of the cervical spine on October 11, 2001 (Tr. 218).

On December 4, 2001, Plaintiff had her annual examination with Dr. Grate, who diagnosed hematochezia, chronic shoulder pain, and vaginitis and prescribed medication (Tr. 216-17).[4]  A few days later, Plaintiff complained of dizziness which Dr. Grate believed was secondary to anemia. A colonoscopy was scheduled for January. On December 11, 2001, Plaintiff saw Dr. Grate with complaints of a knot in her right breast and headaches. Dr. Grate diagnosed a right breast nodule and recommended a mammogram (Tr. 215).

On January 7, 2002, Dr. Grate noted that Dr. Gilchrist recommended a colonic polyp removal on Plaintiff (Tr. 214).[5]  On January 15, 2002, Plaintiff returned to Dr. Grate with complaints of breast pain, nipple soreness, attacks of vertigo, and swelling of her hands in the morning. She reported that she stopped taking Zoloft (an anti-depressant), which Dr. Grate prescribed previously, because she thought it caused her dizziness. Dr. Grate diagnosed iron deficiency anemia, breast pain, and constipation. She instructed Plaintiff to resume taking Zoloft and prescribed Aciphex (medication for acid reflux disease) (Tr. 213-14, 345-46).

On January 22, 2002, Plaintiff saw Dr. Grate again with complaints of a "swollen vein" on the left side of her abdomen. Dr. Grate diagnosed an edematous, tender, superficial vein. She recommended warm compresses and continued Plaintiff's medications (Tr. 212, 344).  Plaintiff followed up with Dr. Grate in February 2002, reporting that her edematous vein was resolved.

---

[4]     The Commissioner's Brief states that this examination occurred on November 4, 2001, but it appears to the Court that this date is not correct, as it is inconsistent with some of the notes in that record (Tr. 216).

[5]     The Court cannot find Dr. Gilchrist's medical records in the record before it.

She complained of eye and neck pain and abdominal bloating. Dr. Grate diagnosed neuralgia and resolved superficial phlebitis (Tr. 212, 344).

In March 2002, Plaintiff saw Dr. Grate with concerns that her neck, shoulder, and gastrointestinal symptoms were signs of heart disease. Dr. Grate noted that Plaintiff had a normal echocardiogram. She also administered a mini-mental status exam, on which Plaintiff scored 30 out of 30, indicating normal cognitive functioning. Dr. Grate diagnosed musculoskeletal pain and GERD (Tr. 210-11).

On April 27, 2002, Karen Scott, Psy.D., a State agency psychologist, reviewed the medical evidence and found that Plaintiff's depression resulted in no more than mild limitations on her activities of daily living, social functioning, and concentration, persistence, and pace. She also found that Plaintiff had not experienced any episodes of decompensation. She therefore concluded that Plaintiff's mental impairment was not severe (Tr. 267-80).

On June 6, 2002, Plaintiff was seen by Dr. Grate's colleague at Saluda Family Practice for complaints of a tingling sensation in her chest and headaches. She reported that her depression was improved, her appetite was good, her GERD was under control, and she had "mild" low back pain and no edema. GERD, musculoskeletal pain, depression, anxiety, and "Hep[atitis] B carrier" were diagnosed and her medications were continued (Tr. 210, 342-43).

On June 17, 2002, Plaintiff saw Dr. Grate with complaints of shoulder and neck pain, sore throat, bunions, snoring, and difficulty sleeping. Dr. Grate diagnosed snoring, hot flashes with irregular menses, bunions, and chronic shoulder pain. She advised Plaintiff to wear wide shoes because her bunions were "not enough for her to want to consider surgery." She referred Plaintiff to Richard Bogan, M.D., of the Sleep Disorders Center for sleep apnea testing. She also noted that Plaintiff was planning to return to school "to learn automation in the office" (Tr. 208).

Plaintiff saw Dr. Bogan on July 8, 2002. She reported that she snored loudly and experienced sleep apnea, frequent awakenings, and daytime fatigue and sleepiness. Dr. Bogan diagnosed possible obstructive sleep apnea with hypersomnia, reflux, depression, arthritis, and anemia by history. He recommended a sleep study (Tr. 179-81, 185-87). The sleep study, which Plaintiff underwent on August 18, 2002, confirmed that she had obstructive sleep apnea (Tr. 184). On September 9, 2002, Dr. Bogan recommended a continuous positive air pressure (CPAP) machine trial and CPAP titration study (Tr. 178, 183).

On September 17, 2002, Plaintiff presented to Dr. Grate with complaints of body aches, restlessness, and headaches. She reported problems wearing a handbag on her left shoulder and having to adjust her seating after driving for more than an hour. Dr. Grate found that she had full shoulder ranges of motion, anterior shoulder pain, normal upper extremity reflexes, and brisk lower extremity reflexes. She diagnosed sleep apnea, depression, and chronic shoulder pain and prescribed medications (Tr. 207, 341). In October and November 2002, Dr. Grate treated Plaintiff for GERD, moles, a breast nodule, and bronchitis, and prescribed Zoloft, Vioxx, and Nexium (Tr. 206-07, 244).

On November 18, 2002, D.C. Price, Ph.D., a State agency psychologist, reviewed the medical evidence and found that Plaintiff's depression and anxiety resulted in mild limitations on her activities of daily living, social functioning, concentration, persistence, and pace, and no episodes of decompensation. Therefore, Dr. Price found that Plaintiff did not have a severe mental impairment (Tr. 293-306).

On November 26, 2002, Gerald Fisher, M.D., a State agency physician, reviewed the medical evidence and found that Plaintiff could perform medium work that did not require

climbing of ladders, ropes, or scaffolds, more than occasional climbing of ramps and stairs, or more than frequent balancing, stooping, kneeling, crouching, and crawling (Tr. 285-92).

On December 2, 2002, Plaintiff saw Dr. Bogan, reporting that she used her CPAP machine "intermittently." Dr. Bogan recommended that her CPAP machine be adjusted and that she undergo a CPAP titration study (Tr. 177), which showed improved obstructive sleep apnea with periodic limb movements (Tr. 182). On December 17, 2002, Plaintiff saw Dr. Grate for allergies, nasal congestion, and pain in her face and shoulders. Dr. Grate recommended a sinus CT scan (Tr. 204-05), which was normal (Tr. 238).

In April 2003, Plaintiff returned to Dr. Grate with complaints of vertigo and congestion. Dr. Grate diagnosed labyrinthitis and prescribed Antivert (anti-vertigo medication). On May 30, 2003, Plaintiff told Dr. Grate of increased stress, and that she had separated from her husband and had lost her income. Plaintiff requested a referral to a psychiatrist. Dr. Grate diagnosed depression and referred Plaintiff to a psychiatrist (Tr. 202).

Plaintiff returned to Dr. Grate on August 1, 2003 with complaints of dizziness. She reported that she "ha[d] been looking for work" and was separated from her husband. Dr. Grate found that she had good eye contact and was upbeat. She diagnosed rhinitis, prescribed medications, and encouraged Plaintiff to seek employment (Tr. 200). Dr. Grate also treated Plaintiff for changes in bowel habits (Tr. 199), which Dr. Grate believed was secondary to stress and poor eating habits. Dr. Grate prescribed Zoloft (Tr. 199).

On November 10, 2003, Plaintiff saw Dr. Grate for follow-up. Dr. Grate found that she had full left upper extremity ranges of motion, stability, strength, and tone, and left upper trapezius muscle tenderness. She diagnosed sinusitis and "stable" depression and pre-menstrual syndrome. She prescribed medications (Tr. 195, 197-98).

In December 2003 and January 2004, Plaintiff received treatment from other physicians at Saluda Family practice for acute sinusitis, for which she was prescribed Spectracef, and bronchitis, for which she was prescribed an antibiotic (Tr. 194-96).

In February 2004, Plaintiff saw Dr. Grate for right shoulder pain, abnormal menses, dizziness, and joint pain. Dr. Grate diagnosed resolved iron deficiency anemia, improved depression, and improved pre-menstrual tension syndrome. By history, Plaintiff was a Hepatitis B carrier and had colonic polyps. Dr. Grate recommended a mammogram, which was normal (Tr. 189-90, 192-93, 237, 240). Dr. Grate also treated Plaintiff for viral gastroenteritis (Tr. 188).

On May 6, 2004, Frank K. Ferrell, M.D., a State agency physician, reviewed the medical evidence and found that Plaintiff could perform medium work that required no more than occasional climbing or crawling or more than frequent balancing, stooping, kneeling, or crouching. He also found that she should avoid concentrated exposure to hazards (machinery, heights, etc.) (Tr. 259-66).

On August 23, 2004, Plaintiff presented to Sumeer Lal, M.D., a neurologist, for evaluation. Plaintiff's medications were Vioxx, Nexium, and Zoloft. Dr. Lal found that she "appear[ed] to be in some discomfort." He also found that she had no motor deficits except for some questionable "mild" triceps weakness on the right, normal reflexes, and no upper motor neuron signs. He noted radiographic findings indicating "fairly significant" cervical disc degeneration and dessication at C6-7 with foraminal narrowing and similar findings at C5-6,although not as significant. He concluded that Plaintiff's best option would be to consider a 2-level anterior discectomy and fusion. He said, "I do not feel that conservative therapy is going to be beneficial in the long run since she is progressively deteriorating over the last 4 years [sic] and conservative therapy at this point hasn't been of any major success" (Tr. 347-48).

On March 21, 2005, Plaintiff complained to Dr. Grate of sinus problems. Dr. Grate noted that Plaintiff was working with Vocational Rehab to train for coding. Dr. Grate diagnosed stable depression and GERD. She also diagnosed sinusitis and arthritis and continued on Zoloft and Nexium, and prescribed Amoxicillin for her sinusitis and Mobic for arthritis (Tr. 334-35). On June 7, 2005, Plaintiff returned to Dr. Grate with low back pain, constipation, vertigo, and sinus problems. Dr. Grate diagnosed allergic rhinitis, hemorrhoids, and muscle spasms and prescribed medications (Tr. 330-33). On June 24, 2005, Plaintiff complained to Dr. Grate of a lower backache. She said that her "symptoms had been worsening" recently. Dr. Grate diagnosed muscle spasms and prescribed medications (Tr. 328-29).

In September 2005, Plaintiff followed-up with Dr. Grate, reporting that she had been feeling more depressed. She also reported that she had "been out of Zoloft" for one month, was looking for work, and could not pass a math test "which was very basic in word problem format." She complained of headache, vertigo, difficulty reaching to zip her dress with her right arm, and needing to sleep on her back because of shoulder pain. Dr. Grate diagnosed depression, allergic rhinitis, GERD, and inadequate material resources and continued Plaintiff's medications but started her on Prozac (Tr. 326-27).

Plaintiff returned to Dr. Grate the following month with complaints of abdominal and neck pain. Dr. Grate diagnosed "worsening" GERD and recommended an upper GI study (Tr. 324-25),which was "grossly unremarkable" (Tr. 339). On November 1, 2005, Dr. Grate noted that Plaintiff did not have a stomach ulcer (Tr. 322). On November 30, 2005, Dr. Grate diagnosed depression, allergic rhinitis, and GERD, and continued Plaintiff's medications (Tr. 319). In December 2005,Plaintiff saw Dr. Grate for follow-up. She reported that she had no complications from her medications. She also reported that her depression was improved,

although she did not "feel fully comfortable in crowds." Dr. Grate diagnosed improved

depression and abdominal pain and increased her Prozac prescription to 40 mg (Tr. 318-19).

Plaintiff underwent an abdominal CT scan, which was normal (Tr. 338).

On March 10, 2006, Plaintiff returned to Dr. Grate with complaints of left arm, finger,

and toe numbness, vertigo, loss of appetite, and hand swelling. She also complained of left arm

pain, a "sensation of food stopping in [her] throat," nausea, and constipation. Dr. Grate found

that she had normal neurological functioning, and full strength and normal reflexes in all of her

extremities. A hepatic function panel was ordered and the liver function tests were elevated. Dr.

Grate ordered a repeat profile in two weeks. Dr. Grate diagnosed resolved unspecified iron

deficiency anemia, premenstrual tension syndromes, cervical spondylosis without myelopathy,

and "hepatitis B carrier." She prescribed medications (Tr. 316-17).

On April 3, 2006, Dr. Grate completed a questionnaire wherein she stated that she had

treated Plaintiff since 1987 for cervical spondylosis, depression, sleep apnea, GERD, heliobacter

pylori infection, neck spasms, hemorrhoids, back pain, hepatitis B carrier, pre-menstrual tension

syndrome, and colon polyps. She said that Plaintiff experienced pain severe enough to

frequently interfere with attention and concentration. She also said that Plaintiff's neck and

shoulder pain would "continue to get worse with time." She stated that Plaintiff could, at one

time, sit for two hours and stand for one to two hours. She also stated that Plaintiff could sit and

stand for a total of about two hours each in an eight-hour workday. Dr. Grate indicated that

Plaintiff could only lift and carry less than ten pounds; rarely twist and climb ladders; and

occasionally stoop, crouch, and climb stairs. She further indicated that Plaintiff could only

perform gross manipulation, fine manipulation, and reaching less than five percent of the time

and would miss four or more days of work per month (Tr. 349-51).

## B.  Other Documentary Evidence

In a daily activities questionnaire dated November 6, 2002, Plaintiff reported that her medications caused drowsiness (Tr. 148).  She also said that she and her husband shared in doing the ironing, laundry, dishes, and mopping (Tr. 148-51).  In her reconsideration disability report dated January 9, 2004, Plaintiff indicated that being in large settings or around a lot of people caused her stress, and that riding in a car for a long time caused her discomfort (Tr. 134-37).  On April 5, 2004, she said that she required assistance getting dressed and had difficulty communicating with her family and the public (Tr. 138).  In a disability report in June 2004, Plaintiff said that she needed help with zippers and buttons and could only drive for short distances (Tr. 145).

## IV.  ADMINISTRATIVE PROCEEDINGS

The Plaintiff filed an application for DIB on September 20, 2002 and an application for SSI on December 30, 2002, and alleging disability beginning March 16, 2001.  Plaintiff's applications were denied initially and upon reconsideration by the Agency.  (Tr. 56-58, 346-348) A request for a hearing was timely filed January 16, 2003.  Her request was dismissed on November 18, 2003, because no reconsidered determination had been issued (Tr. 54-57).

On December 30, 2003, Plaintiff filed an application for supplemental security income pursuant to 42 U.S.C. §§ 1381-83f, Title XVI of the Act (Tr. 352-54).  On January 9, 2004, she filed a request for reconsideration and her claim for supplemental security income was escalated to the reconsideration level to be considered in conjunction with her claim for disability insurance benefits (Tr. 58).  Plaintiff's claims for disability insurance benefits and supplemental security income were denied in reconsidered determinations on May 7, 2004 (Tr. 37, 60-62, 355-58).  She filed a timely request for an ALJ hearing on July 6, 2004 (Tr. 63).

A hearing was held on April 10, 2006, at which Plaintiff, her representative, and a vocational expert were present (Tr. 363-97). At the hearing, Plaintiff testified that she was 55 years old, separated, and lived alone in Saluda, SC (Tr. 365-367). Plaintiff completed her education to a high school level and received a diploma, and has some college course work but no degree (Tr. 368-369). Plaintiff testified that she worked at MaxWay in Saluda, South Carolina as a cashier and was a management trainee from November 2005 to April 2006 (after her alleged onset date), where her work involved lifting up to ten pounds and standing up to six hours (Tr. 370) and working 5 to 6 days a week (Tr. 371). She quit that job because it was stressful and she was not able to move quickly; in addition, the job required a lot of standing, which caused pain in her back, neck, arms, and legs, and she felt the pressures of computer work and completing written reports. As a manager trainee, once she became a manager she would be required to work about 52 hours a week (Tr. 369-73). She also said that she quit that job because of the "bacteria in [her] system that could lead into an ulcer" (Tr. 374).

Before Plaintiff worked at MaxWay, Plaintiff worked as a manufacturing technician for Fuji Film in Greenwood, from 1995 to 2001 (Tr. 374-375). As a manufacturing technician, Plaintiff was responsible for monitoring machines, inspecting products and film, and recording machine malfunctions. Plaintiff was required to lift 25-pound boxes on the job. Plaintiff worked in manual packaging as well until her job was terminated (Tr. 375-376).

Prior to working at Fuji, Plaintiff was employed as a cashier for about six months at a Family Dollar store in Saluda, South Carolina (Tr. 376). Her duties included greeting customers, ringing up sales, and lifting 20 to 25 pounds when helping to unload the truck (Tr. 376).

Plaintiff worked as an administrative assistant at American Stein Pro for approximately six months. Before that job, Plaintiff worked for Saluda County Council on Aging for nineteen

and half years, until 1994. She was employed as a meals coordinator for their meals program for the elderly. Her duties included ordering and delivering meals, supervising the nutrition staff that plated the meals, and providing social and recreational services (Tr. 377-378). Prior to that employment, Plaintiff worked part-time for a nine-month contract period with the school district around 1970 (Tr. 378).

Plaintiff testified about her past medical and psychological history, stating that the conditions that bothered her the most and kept her from working were the osteoarthritis in her neck and spine, which causes pain, and depression (Tr. 379). Plaintiff also has Hepatitis B, which causes her to get tired, and restless leg syndrome, although she is not on any medications for the latter (Tr. 379-81). She also testified that she took Vioxx, and later, Mobic, and Aleve for her osteoarthritis, which helped relieve her symptoms (Tr. 380). She was taking Prozac for her depression (Tr. 381) She testified that she has not received any counseling or mental health treatment other than medications from her primary care physician (Tr. 381). Plaintiff stated that she had sleep apnea, for which she still used a CPAP machine, and took Prilosec, an antibiotic, and Pepto-Bismol for her pyloric heliobacteria (Tr. 382). She also stated that she experienced dizziness when her "sinus gets bad" and because of her sinus medication (Tr. 383). Her pain gets better when she takes her medication and relaxes (Tr. 383).

Plaintiff testified that she could only stand for 30 minutes to an hour and sit for 30-60 minutes before she felt neck pain and needed a break. She said she could lift fewer than ten pounds (Tr. 384). She has problems with her vision, but glasses corrected her vision problem (Tr. 385). She has difficulty using her hands and fingers, and does not have much strength in her grip, but can tie her shoes and button her clothes if the buttons are in the front, but she cannot zip a back zipper (Tr. 385-86). She testified that she experienced memory problems; in the past

year, Dr. Crate had performed a memory test on Plaintiff but Plaintiff was unable to remember if she was given the results (Tr. 386). She also has difficulty with concentration; she is unable to concentrate on more than one task at a time (Tr. 386-87).

She said she did not think she had problems getting along with other people (Tr. 387). She testified that she cooked for herself two or three times a week and swept the floor two or three times per week, made her bed, grocery shopped with her daughters, and drove a car (Tr. 387-89). Her children washed her laundry for her and brought her meals the other times, or came to her home and cooked (387-88). Plaintiff drove herself to the hearing because her children were working (Tr. 388) She can take a shower alone, but needs someone to wash her back for her (Tr. 388). In the morning, she gets up, eats cereal, takes her medications, takes a bath, makes her bed, and rests for two hours and watches television (Tr. 389). She also reads spiritual readings (Tr. 390). She attends church twice a month, but is unable to sit through the whole service and needs to get up and walk around (Tr. 390-391). She attends Bible study when someone can pick her up, and goes to choir practice once or twice a month (Tr. 389-91).

Robert Brabham, a vocational expert, testified that Plaintiff's past relevant work as a cashier was semi-skilled and light as generally performed (Tr. 392). He testified that Plaintiff's past relevant work as a manufacturing technician was semi-skilled and light as generally performed, and medium as she actually performed it (Tr. 392-93). He also testified that her past relevant work as a secretary was skilled and sedentary, and that her past relevant work as a food service coordinator was skilled and light as generally performed and as she performed it (Tr. 393-94). He stated that Plaintiff had transferable job skills from her past relevant work, including skills in supervision, report writing, record keeping, and use of computers and general

office equipment (Tr. 394).  He also stated that these skills would transfer to the semi-skilled

sedentary jobs of order clerk and dispatcher (Tr. 394-95).

On June 23, 2006, the ALJ issued a decision in which he found that Plaintiff was not

disabled (Tr. 13-26).  Plaintiff requested review of the ALJ's decision, which the Appeals

Council denied on October 6, 2006 (Tr. 8-11).  Therefore, the ALJ's decision became the

Commissioner's final decision for purposes of judicial review.  The Plaintiff has exhausted her

administrative remedies, the parties have briefed the case, and it is now ripe for judicial review

under Section 205(g) of the Act, 42 U.S.C. § 405(g).  *See* 20 C.F.R. §§ 404.981, 416.1481.

## IV.  THE COMMISSIONER'S FINDINGS

In making his determination that the Plaintiff is not entitled to benefits, the

Commissioner has adopted the following findings of the ALJ:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2006.  (Tr. 18)

2.  The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b), 404.1571, *et seq.*, 416.920(b) and 416.971, *et seq.*).  (Tr. 18)

3.  The claimant has the following severe impairments: cervical spondylosis with mild stenosis and episodic dizziness (10 CFR 404.1520(c) and 416.920(c)).  (Tr. 19)

4.  The claimant does not have an impairment or combination of impairments that meet or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (10 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (Tr. 19)

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently and stand and/or walk at least six hours in an eight-hour workday with no exposure to hazardous conditions such as dangerous moving machinery or unprotected heights.  (Tr. 19)

6.  The claimant is capable of performing past relevant work as a cashier, and as a manufacturing technician at a film company, a secretary/office assistant, and a food service coordinator.  This work does not require the performance of work-related

activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965). (Tr. 25)

7.    The claimant has not been under a "disability," as defined in the Social Security Act, from March 16, 2001, through the date of this decision. (20 CFR §§ 404.1520(f) and 416.920 (f)). (Tr. 26)

## V.  APPLICABLE LAW AND REGULATIONS

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability." 42 U.S.C. § 423(a). Disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1509; *Barnhart v. Walton*, 535 U.S. 212 (2002).

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions that are to be asked during the course of a disability determination. 20 C.F.R. §§ 404.1520, 1520a; *Heckler v. Campbell*, 461 U.S. 458 (1983); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002); *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981). The five questions are:

(1) whether the claimant is engaged in substantial gainful activity as defined in Sections 404.1510, 404.1571 et seq., 416.971 *et seq.* If such determination is affirmative, no disability will be found. 20 C.F.R. §§ 404.1520, 416.920.

(2) whether the claimant's impairments meet the durational requirement (Sections 404.1509 and 416.909) and are severe (Sections 404.1520(c), 416.920(c)). If they do not meet those requirements, no disability will be found. 20 C.F.R. §§ 404.1509, 416.909, 404.1520(c), 416.920(c).

(3) whether the claimant has an impairment which meets or medically equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1) (the "Listing of Impairments") 20 C.F.R. §§ 404.1520(d), 416.920(d). If

one of the listings is met, disability will be found without consideration of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).

(4) whether the claimant has an impairment which prevents past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e).

(5) whether, in light of vocational factors such as age, education, work experience and residual functional capacity ("RFC"), the claimant is capable of other work in the national economy. The claimant is entitled to disability only if the answer is "no." 20 C.F.R.§§ 404.1520(f), 416.920(f).

An individual may be determined not disabled at any step if found to be: gainfully employed, not severely impaired, not impaired under the Listing of Impairments (20 C.F.R. Pt. 404, Subpart P, App. 1), or capable of returning to former work. In such case, further inquiry is unnecessary. If, however, the claimant makes a showing at Step Four that return to past relevant work is not possible, the burden shifts to the Commissioner to come forward at Step Five and "prove that the claimant, despite her impairments, can perform a 'significant number of jobs in the national economy.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (*per curiam*), *quoting Walls v. Barnhart*, 296 F.3d at 290. The Commissioner may meet this burden by relying on the Medical-Vocational Guidelines (the "Grids") or by calling a vocational expert to testify. 20 C.F.R. § 404.1566. The Commissioner must prove both the claimant's capacity and the job's existence. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). If an individual is found not disabled at any step, further inquiry is unnecessary. *See Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). Only if the final step is reached does the fact finder consider the claimant's age, education, and work experience in light of his or her residual functional capacity. *See Hall*, 658 F.2d at 264. Residual functional capacity is a determination, based on all of the relevant medical and non-medical evidence, of what a claimant can still do despite her impairments; the

determination of the residual functional capacity is the responsibility of the ALJ. *See* 20 C.F.R. §§ 404.1520, 404.1545-46; SSR 96-8p.

With respect to the general procedure for determining SSI disability benefits, the standard consists of a two-fold test: The claimant must show a medically determinable physical or mental impairment, and the impairment must be such as to render the claimant unable to engage in substantial gainful employment. *Walker v. Harris*, 642 F.2d 712 (4th Cir. 1981), *citing Blalock v. Richardson*, 438 F.2d 773 (4th Cir. 1972); 42 U.S.C. § 423(d); 20 C.F.R. § 404.1501(b).

## VI.  SCOPE OF REVIEW

Under the Social Security Act, 42 U.S.C. § 405(g) and § 1383(6)(3), this court's scope of review of the Commissioner's final decision is limited to:  (1) whether the decision of the Commissioner is supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The Court's scope of review is specific and narrow.  It does not conduct a *de novo* review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees with it, so long as it is supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Smith v. Chater*, 99 F.3d 635, 637 (4th Cir. 1996); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Johnson v. Barnhart*, 434 F.3d at 653, *citing Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted).

"Consequently, judicial review . . . of a final decision regarding disability benefits is limited to determining whether the findings are supported by substantial evidence and whether the correct law was applied." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). In reviewing for substantial evidence, the reviewing court should not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency. *Seabolt v. Barnhart*, 481 F.Supp.2d 538, 545 (D.S.C. 2007), *citing Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (alteration in original). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Johnson v. Barnhart*, 434 F.3d at 653, *citing Craig*, 76 F.3d at 589 (internal quotation marks omitted); *see also Hays*, 907 F.2d at 1456 (It is the duty of the ALJ reviewing the case, and not the duty of the Court, to make findings of fact and resolve conflicts in the evidence) *and Smith v. Chater*, 99 F.3d at 638 (the duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court) (citation omitted). Therefore, if substantial evidence supports the Commissioner's decision that a claimant is not disabled, the decision must be affirmed. *Blalock*, 483 F.2d at 775.

## VII.  THE ALJ'S ANALYSIS

Consistent with the five step "sequential evaluation" for the adjudication of disability claims, the ALJ first found that the Plaintiff had not engaged in substantial gainful activity at any time relevant to this decision (Tr. 18, Finding 2). At Step Two, the ALJ found that Plaintiff established that her cervical spondylosis with mild stenosis and episodic dizziness were "severe"

impairments[6] (Tr. 19, Finding 3).  At Step Three, the ALJ found that these medically

determinable impairments did not meet or medically equal any of the criteria listed in 20 C.F.R.

Pt. 404, Subpt. P, Appendix 1 (Tr. 19, Finding 4).  Prior to determining at Step Four whether

Plaintiff could perform her past relevant work, the ALJ assessed Plaintiff's residual functional

capacity by evaluating the medical evidence and Plaintiff's subjective complaints (Tr. 19-25),

and found that Plaintiff retained the residual functional capacity for light work[7] (she could to lift

and carry up to 20 pounds occasionally and 10 pounds frequently and stand or walk 6 hours in an

8-hour work day) that did not require exposure to hazardous conditions such as dangerous

moving machinery or unprotected heights (Tr. 19-25, Finding 5).  Thus, at Step Four of the

evaluation process, the ALJ found Plaintiff's RFC[8] did not prevent the claimant from performing

her past relevant work as a cashier, as a manufacturing technician at a film company, as a

---

[6]     An impairment or combination of impairments is "severe" if it "significantly limits [an individual's]
physical or mental abilities to do basic work activities."  *Id.* §§ 404.1520(c), 416.920(c); *see Bowen
v. Yuckert*, 482 U.S. 137, 140-42 (1987); Social Security Ruling (SSR) 85-28; SSR 96-3p.
Conversely, "an impairment can be considered as 'not severe' only if it is a slight abnormality which
has such a minimal effect on the individual that it would not be expected to interfere with the
individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler*, 734
F.2d 1012, 1014 (4th Cir.1984) (citations and internal punctuation omitted).

[7]     Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects
weighing up to 10 pounds.  Light work requires a good deal of walking or standing, or sitting most of
the time with some pushing and pulling of arm or leg controls.  *See* 20 C.F.R. §§ 404.1567(b),
416.967(b); SSR 83-10.

[8]     RFC is a measurement of the most a claimant can do despite his limitations.  *See* 20 C.F.R. §
404.1545(a).  According to the Social Security Administration,

        RFC is an assessment of an individual's ability to do sustained work-related physical and
        mental activities in a work setting on a regular and continuing basis.  A 'regular and
        continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

        Social Security Regulation (SSR) 96-8p (emphasis added).  RFC is to be determined by the
        ALJ only after he considers all relevant evidence of a claimant's impairments and any related
        symptoms (*e.g.*, pain).  See 20 C.F.R. § 404.1529(a).

secretary/office assistant, and as a food service coordinator (Tr. 25, Finding 6). The ALJ

concluded that Plaintiff was not under a disability as defined in the Social Security Act, as

amended. (Tr. 26, Finding 7)

### VIII.  PLAINTIFF'S OBJECTIONS

The Plaintiff raises four (4) objections in her brief:

1.   **The ALJ failed to properly assess the treating and evaluating physician's opinions as required by 20 CFR § 404.1527(d)(1)-(6), SSR 96-2p and SSR 96-5p.**

2.   **The ALJ failed to consider all of the Plaintiff's impairments in considering the Plaintiff's application for disability benefits.**

3.   **The ALJ did not assess the Plaintiff's mental impairments in the manner required by the regulations.**

4.   **The ALJ failed to correctly assess the Plaintiff's credibility.**

### IX.  DISCUSSION

Under 42 U.S.C. § 405(g), the scope of review limits questions before the Court to (1)

whether the Commissioner's decision is supported by substantial evidence, and, (2) whether the

ultimate conclusions reached by the Commissioner are legally correct under controlling law. *See*

*Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th

Cir. 1990). The scope of review authorized by Congress in § 405(g) is specific and narrow. The

language of § 405(g) precludes a de novo review of the evidence and requires that the Court

uphold the Commissioner's decision, even if the Court disagrees, as long as it is supported by

substantial evidence. *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v.*

*Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Ultimately, it is the duty of the ALJ reviewing

the case, and not the responsibility of the courts, to make findings of fact and resolve conflicts in the evidence.  See *Hays*, 907 F.2d at 1456.

The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  "Substantial evidence" has also been defined as ". . . evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to satisfy a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

**1.      The ALJ failed to properly assess the treating and evaluating physician's opinions as required by 20 CFR § 404.1527(d)(1)-(6), SSR 96-2p and SSR 96-5p.**

The ALJ was obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list:  (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006), *citing Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (*citing* 20 C.F.R. § 404.1527 (2005)).  Courts typically "accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (*quoting Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).

The treating physician rule is not absolute, and may be disregarded if persuasive contradictory evidence exists to rebut it. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Although the Commissioner is authorized to give controlling weight to the treating source's opinion if it is not inconsistent with substantial evidence in the case record and it is well supported by clinical and laboratory diagnostic techniques, 20 C.F.R. § 404.1527(d)(2), "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); SSR 96-2p. Accordingly, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Hunter v. Sullivan*, 993 F.2d at 35.

In the present case, the ALJ carefully considered Dr. Grate's April 2006 opinion when making his decision that the Plaintiff was not disabled (Tr. 24-25). As discussed above, on April 3, 2006, Dr. Grate filled out a functional capacity assessment form (the "Assessment Form") regarding Plaintiff's impairments (Tr. 349-351). Dr. Grate indicated on the Assessment Form that she had been Plaintiff's primary care physician since 1987 and she had seen the Plaintiff about every three months over the past three years (Tr. 349). Dr. Grate listed the following diagnoses on the Assessment Form: cervical spondylosis with myelopathy, depression, sleep apnea, GERD, Heliobacter pylori infection, spasm of neck muscles, external hemorrhoids, back pain, Hepatitis B carrier, premenstrual tension syndrome, and colon polyp. (Tr. 349) The Assessment Form asked Dr. Grate to identify the laboratory and test results that showed the

Plaintiff's medical impairments; Dr Grate listed the following tests: (1) in 2004, an MRI of the cervical spine which showed moderate narrowing of the C5-6 and C6-7 disc space, with the right side having more narrowing than the left; (2) in 2005, Plaintiff failed a basic math test for job placement; (3) in 2006, a test for Heliobacter Pylori was positive (Tr. 349). With respect to pain, Dr. Grate stated: (1) bilateral shoulder pain is dull ache or sharp pain when she lies on her left side; (2) neck pain is tightness; (3) epigastric pain is burning or sensation of fullness; (4) back pain is intermittent pain (Tr. 349).

The Assessment Form also asked Dr. Grate to list Plaintiff's specific restrictions. Dr. Grate stated that Plaintiff would experience pain severe enough to "frequently" interfere with her attention and concentration; her prognosis was that Plaintiff's neck and shoulder pain would continue to get worse with time, and it was noted her neurosurgeon recommended surgery (Tr. 350). Dr. Grate also noted that the Plaintiff would be limited to sitting upright to about two hours a day; could stand about two hours total in a day; Plaintiff could rarely twist or climb ladders and only occasionally stoop, crawl, and climb stairs with no repetitive use of her upper extremities; she could lift and carry less than 10 pounds in a competitive work environment; and would have significant limitations doing repetitive reaching, handling and fingering (Tr. 350-351). Dr. Grate estimated that Plaintiff could only use her upper extremities less than 5 % of the day for gross or fine manipulation, or reaching, and was likely to be absent more than four days a month from work as a result of her impairments (Tr. 351).

In the hearing decision, the ALJ considered the opinions provided by Dr. Grate (Tr. 25) and rejected these opinions because they were not consistent with her own treatment notes and

previous statements (Tr. 25); *see Craig*, 76 F.3d at 590 (a physician's opinion should be

accorded "significantly less weight" if it is not supported by the clinical evidence or if it is

inconsistent with other substantial evidence); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); SSR

96-2p.

Evidence of record showed that Plaintiff filed a disability claim with her employer's

insurance company for disability on March 16, 2001 (Tr. 160). However, four days earlier, on

March 12, 2001, Dr. Grate completed an "Associate Work Status Report" which diagnosed

Plaintiff with osteoarthritis of C-spine and external hemorrhoids, and which stated that Plaintiff

could return to "alternate work" which did not require the lifting of more than ten pounds (Tr.

168-172). Three months after that, on June 25, 2001, Dr. Grate's treatment notes reflected that

Plaintiff had full shoulder ranges of motion, 5/5 deltoid strength, and 5/5 wrist extension (Tr.

221). In October 2001, Dr. Grate again found that Plaintiff had full shoulder ranges of motion

and normal strength (Tr. 218). In November 2001, a physical examination by Dr. Grate was

normal (Tr. 216-17). In June 2002, Dr. Grate noted that Plaintiff "is planning to return to school

to learn automation in the office." (Tr. 208) In September 2002, Dr. Grate found that Plaintiff

had full ranges of motion in her shoulders and normal upper extremity reflexes (Tr. 207, 341).

In August 2003, Plaintiff told Dr. Grate that she had been looking for work, and Dr. Grate

encouraged Plaintiff to seek employment (Tr. 200). Two months later, Dr. Grate found that

Plaintiff had full left upper extremity ranges of motion, stability, strength, and tone (Tr. 195,

197-98), and in March 2006, found that she had normal neurological functioning, and full

strength and normal reflexes in all of her extremities (Tr. 316-17).

Plaintiff argues that the ALJ rejected Dr. Grate's assessment for two primary reasons:

(1) the ALJ stated Dr. Grate had earlier provided an opinion in 2000 that the Plaintiff could perform sedentary work, and had encouraged the Plaintiff to seek employment in 2003; the ALJ alleged there was no medical evidence subsequent to those statements indicating a "deterioration in the Plaintiff's condition." Id. (2) The ALJ alleged that the "diagnostic studies show only minimal cervical stenosis" with no other positive signs, and therefore the treatment notes and other evidence "persuasively contradicted" the assessment of Dr. Grate.[9]

The ALJ stated that he did not give controlling weight to Dr. Grate's opinion because it was not supported by her own treatment notes (Tr. 25), Indeed, Dr. Grate stated on the Fuji Associate Work Status Report in March 2001 (not 2000, as Plaintiff states) that Plaintiff could perform "alternate work" (Tr. 168) and that Plaintiff's "Expected Return to Work Date" was "when employer can find new job assignment." (Tr. 169) Thus, the record reflects that Dr. Grate considered Plaintiff as able to work <u>when</u> an appropriate job assignment became available. Furthermore, Dr. Grate noted on August 1, 2003 that Plaintiff "has been looking for work" and consequently, Dr. Grate encouraged Plaintiff to seek employment (Tr. 200). Plaintiff's pursuit of employment is completely inconsistent with her claim of disability.

Next, Plaintiff contends that the ALJ incorrectly stated that there was no indication of a deterioration in the Plaintiff's case since August 2003,[10] and refers the Court to Dr. Grate's statement in April 2006 that her "neck and shoulder pain [would] continue to get worse with time" and Dr. Lal's statement in August 2004 that her condition was "progressively deteriorating" (Pl's Br. 19; Tr. 348, 350). Plaintiff has mis-read the ALJ's decision. The ALJ **did not** state that there had been no deterioration in Plaintiff's condition since August 2003.

---

[9]    Plaintiff's Brief at 18.

[10] Plaintiff's Brief at 19-20.

Rather, he stated that Dr. Grate's **own progress notes** did not indicate deterioration in her

condition since August 2003 (Tr. 25) a statement which was supported by the record (Tr. 189-90,

192-98, 237, 240, 316-19, 324-25). As discussed above, the ALJ indicated that he did not give

controlling weight to Dr. Grate's opinion because it was not supported by her own treatment

notes (Tr. 25), in which she stated that Plaintiff could perform "alternate work" (Tr. 168-72), and

which reflected that Plaintiff sought work, and was encouraged by Dr. Grate to do so (Tr. 200),

and wherein Dr. Grate found that Plaintiff had normal ranges of motion, strength, and reflexes

upon physical examination (Tr. 195, 197-98, 207, 216-18, 221, 316-17, 341).

In support of her argument that the ALJ erred, Plaintiff points out to the Court (Plaintiff. Br. at

19) that Dr. Grate noted in June, 2005 that Plaintiff's "symptoms [of pain] have been worsening

recently." (Tr. 328) It appears to the Court, however, that Plaintiff has taken this statement out

of context. Dr. Grate's June 24, 2005 treatment note indicates that this statement specifically

refers to a "lower backache" of new onset, and does not refer to chronic cervical spine pain. Dr.

Grate's note states: "The back pain began approximately 3 weeks ago. The location of the pain

is in the right lower back. **The symptoms have been worsening recently**." (Tr. 328; emphasis

supplied).[11] It seems obvious from the record that Dr. Grate's comment does not refer to

Plaintiff's overall condition for which she claims disability, but is strictly limited to Plaintiff's

report of back pain which had manifested itself on or about June 1, 2005. As the records

indicate, Plaintiff was given a new prescription for Flexeril (#30), and did not request a refill of

---

[11]    The Court is not undertaking a *de novo* review of the record, but necessarily must review the record
in the process of addressing Plaintiff's claims of error.

that medication, and did not complain of lower back pain in her next appointment in September 2005. (Tr. 326)

Plaintiff further argues that the ALJ erred by stating that "diagnostic studies show[ed] only minimal cervical stenosis" (Plaintiff. Br. at 19 [referring to Tr. 25]) although the March 2001 MRI of her cervical spine indicated "significant spinal stenosis" (Pl.'s Br. 19-20, Tr. 224-25). As Plaintiff's Brief states, the radiologist's report of Plaintiff's MRI (Tr. 224-225) does state that "significant spinal stenosis" is indicated (Plaintiff. Br. at 19) at the C5-6 level,[12] but there is much more to the radiologist's report than the three words Plaintiff chooses to set forth in her Brief. Dr. Epstein, a neurosurgeon, characterized Plaintiff's spinal stenosis as "mild" (Tr. 173-74). The ALJ specifically relied on Dr. Epstein's evaluation when weighing Dr. Grate's opinion (Tr. 25). In addition, the ALJ's summation of the results of the MRI echoed Dr. Epstein's report:

> It showed some flattening or compression with bulging at the C5-6 and C6-7 consistent with cervical spondylosis and incipient mild spinal stenosis [Tr. 160-174, emphasis supplied by the Court].

Although the Plaintiff accuses the ALJ of substituting his medical judgment for that of Dr. Grate,[13] the Court disagrees. Moreover, the ALJ properly rejected Dr. Grate's opinion because it was not consistent with other substantial evidence in the record. A March 2001 MRI of Plaintiff's cervical spine showed "mild" disc bulging at C4-5 (Tr. 224-25). This same month, Dr. Epstein, a neurosurgeon who examined the Plaintiff, found that Plaintiff had normal bicipital

---

[12]   The Court is unable to locate anywhere in the MRI report the Plaintiff's claim in her Brief that the report states there was "significant spinal stenosis at C6-7". (Plaintiff. Br. at 19).

[13]   Plaintiff's Brief at p. 20.

and brachioradialis reflexes, only "minimally depressed" triceps reflexes, full muscle strength, and intact sensation. Dr. Epstein specifically stated: "Review of [March 2001] MRI shows multilevel spondylosis with moderate disc bulging producing <u>mild</u> spinal stenosis." (Tr. 174, emphasis supplied by the Court) Dr. Epstein did not suggest that Plaintiff was unable to work, but instead stated that Plaintiff "would be best served with a position at work that would require less strenuous activities which in turn, provide some pain relief." (Tr. 173-74).

In August 2004, Dr. Lal, another examining neurosurgeon, found that Plaintiff had no motor deficits, except for some questionable "mild" triceps weakness on the right, normal reflexes, and no upper motor neuron signs (Tr. 347-48). *See, e.g., Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (findings and opinions of examining physicians constitute persuasive evidence in support of the ALJ's decision).

In addition, State agency physicians, in September 2001, November 2002, and May 2004 specifically considered the March 2001 MRI of Plaintiff's cervical spine in determining that she could perform a range of medium work (Tr. 259-66, 285-92, 308-15). By regulation, State agency physicians are expert opinions which the ALJ must consider. *See* 20 C.F.R. § 404.1527(f)(2) ("The ALJ is entitled to rely on the opinions of reviewing physicians when considering whether the claimant meets the requirements of a listed impairment."); *Hunter v. Sullivan* 993 F.2d 31, 35 (4th Cir. 1992) (an ALJ may properly give significant weight to an assessment from a non-treating physician). (Tr. 259-66, 285-92, 308-15), which the ALJ noted as generally consistent with his conclusions (Tr. 24). As noted in the decision, however, the ALJ

determined that Plaintiff was able to perform light work, with no exposure to hazardous

situations such as unprotected heights or dangerous moving machinery." (Tr. 23)

While Plaintiff correctly notes that the opinions of State agency physicians are generally

accorded less weight than the opinions of a treating physician (Pl.'s Br. 20), as discussed above,

the opinions of State agency physicians can constitute substantial evidence in support of an

ALJ's decision. *See Smith v. Schweiker*, 795 F.2d 343, 345-46 (4th Cir. 1986) (opinion of a

non-examining physician can constitute substantial evidence to support the Commissioner's

decision); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) ("[T]he testimony of a

non-examining, non-treating physician should be discounted and is not substantial evidence

when totally contradicted by other evidence in the record. However, . . . the testimony of a

non-examining physician can be relied upon when it is consistent with the record. Furthermore,

if the medical expert testimony from examining or treating physicians goes both ways, an ALJ's

determination coming down on the side on which the non-examining, non-treating physician

finds himself should stand.")

For the foregoing reasons, the ALJ's decision to give Dr. Grate's opinion little or no

weight is supported by substantial evidence in the record as a whole and will be upheld by this

Court. *See Hays*, 907 F.2d at 1456.

### 2.    The ALJ failed to consider all of the Plaintiff's impairments in considering the Plaintiff's application for disability benefits.

An impairment or combination of impairments is considered "severe" when it

"significantly limits an individual's physical or mental abilities to do basic work activities." 20

C.F.R. § 404.1520(c); SSR 96-3p. The Regulations define basic work activities to include

Page 32 of  47

walking, standing, sitting, lifting, pushing, pulling, reaching, and using judgment.  20 C.F.R. §§

404.1521, 416.921.  Conversely, "an impairment can be considered as 'not severe' only if it is a

slight abnormality which has such a minimal effect on the individual that it would not be

expected to interfere with the individual's ability to work, irrespective of age, education, or work

experience." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir.1984) (citation omitted).  In the

present case, the ALJ acknowledged the proper legal standard for determining the severity of an

impairment or combination of impairments (Tr. 17).  The ALJ then determined that Plaintiff's

severe impairments included cervical spondylosis with mild stenosis and episodic dizziness (Tr.

19).

### A.  Whether the ALJ erred in failing to consider Plaintiff's impairment in combination

First, Plaintiff argues that the ALJ failed to consider her impairments in combination

(Pl.'s Br. at 22).  The ALJ is required to assess the combined effect of a claimant's impairments

when determining whether a claimant has a severe impairment or combination of impairments

throughout the five-step analytical process.  20 C.F.R. § 404.1523; *Walker v. Bowen*, 889 F.2d

47, 49-50 (4th Cir. 1989).  Specifically, the regulations provide that the ALJ, "will consider the

combined effect of all of [claimant's] impairments without regard to whether any such

impairment, if considered separately, would be of sufficient severity."  20 C.F.R. § 404.1523;

*see, e.g., Cook v. Heckler*, 783 F.2d 1168, 1174 (4th Cir.1986) (remanding due to ALJ's failure

to evaluate claimant's mental impairments in combination with her arthritis); *Walker*, 889 at

49-50 (remanding due to ALJ's failure to "analyze the cumulative effect the impairments had on

the claimant's ability to work").

In this case, the ALJ properly considered the combined effects of Plaintiff's impairments, including her cervical spondylosis and stenosis, allegations of pain, swelling, numbness, weakness, fatigue, limited ability to reach overhead, dizziness, constipation, sensation as if food is stopping in her throat, anxiety, depression, sleep apnea, impaired memory, impaired ability to focus, crying spells, disturbed sleep, occasional limping, bilateral foot problems, year round sinus problems, including rhinitis and acute sinusitis, difficulty communicating with others, anemia, Hepatitis B, colon polyps, positive Heliobacter pylori, and GERD (Tr. 19-22) and adequately explained his evaluation of the cumulative effects of those impairments (Tr. 19-22, 25-26). *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). ("[t]he ALJ must adequately explain his or her evaluation of the combined effects of the impairments.") *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985). The ALJ properly identified, discussed, and evaluated Plaintiff's impairments in combination when determining her ability to work. The Court finds no error.

### B. Whether Plaintiff's Depression was a Severe Impairment

Next, Plaintiff argues that the ALJ erred by finding that the Plaintiff's depression was not a severe impairment. (Plaintiff. Br. at 22-24, citing to Tr. 19). However, the medical evidence does not support Plaintiff's allegation that her depression was a severe impairment. The ALJ found that while the while Plaintiff took medication for anxiety and depression (Tr. 21), Dr. Grate's treatment notes indicated that Plaintiff's depression responded well to medications. From June 2002 to December 2005, Plaintiff's depression was described as "stable" or "improved" (Tr. 195, 197-98, 210, 318, 342-43). *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (a condition is not disabling if the symptoms are reasonably controlled by

medication or treatment). The ALJ also noted that Plaintiff's depression increased in May 2003,

coinciding with increased stresses at home, and Plaintiff asked to be referred to a psychiatrist

(Tr. 21). As the ALJ observed, however, "Plaintiff never underwent examination or treatment by

a psychiatrist, psychologist or other mental health specialist. Her mental health treatment has

been provided by her primary care physician [Dr. Grate] and has consisted of medication

including either Prozac or Zoloft." (Tr. 21, 381)  *See Gross v. Heckler*, 785 F.2d at 1166

(conservative treatment does not support a claim of disability).

Furthermore, in April and November 2002, Drs. Scott and Price, the State agency

psychologists who reviewed the medical evidence at the initial and reconsideration stages of the

administrative process, specifically found that Plaintiff did not have a severe mental impairment.

(Tr. 267-80, 293-306).  *See* SSR 96-6p (opinions of State agency medical consultants must be

considered and weighed as those of highly qualified experts in the evaluation of medical issues

in disability claims under the Act).  An ALJ may properly give significant weight to an

assessment from a nontreating physician. *See Hunter v. Sullivan*, 933 F.2d 31, 35 (4th Cir.

1992).

The ALJ's determination that Plaintiff's depression was not a severe impairment is

supported by substantial evidence and will be upheld by this Court.

### C.  Whether Plaintiff's Upper Extremity Impairments were a Severe Impairment

The Plaintiff also claims on appeal to this Court that she had a severe upper extremity

Impairment which was not recognized by the ALJ.  Plaintiff argues by Brief (Plaintiff. Br. at 24)

that she "repeatedly complained of pain, numbness, and weakness affecting her upper

extremities, including her hands, arms, and shoulders" and refers this Court to the following

pages in the record:  Tr. 161-162, 173, 189, 192, 204, 207, 208, 216, 218, 221, 226, 231, 235,

316, 326, 347-348, 349-351.  Plaintiff's use of the conjunctive ("and") would lead this Court to

assume that Plaintiff "repeatedly" complained of all three feelings (pain, numbness, and

weakness) in each of those medical records.  However, the Court finds this assumption to be

incorrect.  The Court has reviewed the Plaintiff's citations to the record and finds it would have

been more accurate for the Plaintiff to have stated that she complained of pain[14] (173, 189, 192,

204, 207, 208, 216, 221, 235, 326); weakness (Tr. 231); weakness and numbness (Tr. 347-348);

pain and numbness (Tr. 316); and pain and weakness (218, 231).[15]  In fact, Plaintiff only

complained of pain, weakness, and numbness one time, in August 2004, during the examination

by Dr. Lal, a neurosurgeon.  (Tr. 349-351)  However, Dr. Lal's evaluation also found that

Plaintiff had no motor deficits, except for "mild" right triceps weakness, normal reflexes, and no

upper motor neuron signs (Tr. 347-48). *See, e.g., Hunter*, 993 F.2d at 35.  Similarly, although

Plaintiff complained of neck and shoulder pain to Dr. Epstein in March, 2001 (Tr. 173), upon

examination Plaintiff had normal bicipital and brachioradialis reflexes, only "minimally

depressed" triceps reflexes, full muscle strength, and intact sensation (Tr. 173-74).  In May 2001,

Dr. Grate found that Plaintiff had full right shoulder range of motion, deltoid strength, and wrist

extension (Tr. 221).  In October 2001, Dr. Grate found that Plaintiff had full shoulder ranges of

---

[14]     Plaintiff did not "repeatedly complain[]" of anything in the record marked as (Tr. 161-162), as this was
Dr. Grate's statement for FMLA purposes that "Patient complains of arm and neck pain."  Likewise,
Plaintiff did not complain of anything in the record marked as (Tr. 349-351), as this was Dr. Grate's
response dated April 3, 2006 to the Questionnaire.

[15]     The Court cannot determine Plaintiff's complaint at (Tr. 226).

motion and normal strength (Tr. 218), and in November 2001, found a normal physical examination (Tr. 216-17). In September 2002, Dr. Grate found that Plaintiff had normal shoulder ranges of motion and upper extremity reflexes (Tr. 207, 341). In November 2003, Dr. Grate found that Plaintiff had full left upper extremity ranges of motion, stability, strength, and tone (Tr. 195, 197-98). In August 2006, Dr. Grate found that Plaintiff had normal neurological functioning, and full strength and normal reflexes in all of her extremities (Tr. 316-17). Drs. Clarke, Fisher, and Ferrell, all State agency physicians, reviewed the medical evidence in September 2001, November 2002, and May 2004, respectively, and did not note that Plaintiff had any upper extremity limitations (Tr. 259-66, 285-92, 308-15). *See* 20 C.F.R. §§ 404.1527(f), 416.927(f); SSR 96-6p; *see also Perales*, 402 U.S. at 408. The evidence of record does not support Plaintiff's argument that she had severe upper extremity impairments.

Next, Plaintiff argues that "Dr. Grate indicated the Plaintiff would be extremely limited in her ability to perform gross manipulation, fine manipulation, or reaching as a result of her impairments." (Plaintiff. Br. at 25, citing to Tr. 351) As discussed in detail above, the ALJ reviewed Dr. Grate's opinion along with the other evidence of record and, after a careful analysis of the evidence, properly elected to give it little or no weight. Dr. Grate's opinion as to Plaintiff's upper extremity limitations is not supported by other evidence in the record. The ALJ correctly found the Plaintiff had no impairment at all in her ability to perform reaching, and gross and fine manipulation activities. (Tr. 19)

3.    **The ALJ did not assess the Plaintiff's mental impairments in the manner required by the regulations.**

Plaintiff next contends that there was evidence of a mental impairment that allegedly restricted Plaintiff's ability to work and the ALJ erred by failing to follow the procedure for evaluating mental impairments set forth in 20 C.F.R. § 404.1520a. (Pl. Br. at 26)  However, the Plaintiff also admits that "The ALJ did make a function by function assessment as set forth in the regulations " [20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2)]" (Pl. Br. at 26) and refers this Court to Tr. 22.

The Commissioner's regulations provide that, if a claimant alleges a mental impairment in her application for benefits, he must evaluate that mental impairment by applying a special technique found in 20 C.F.R. §§ 404.1520a, 416.920a.  As required, the ALJ applied the special technique and found that Plaintiff's depression resulted in no more than mild limitations on her activities of daily living, social functioning, and concentration, persistence, and pace, and no episodes of decompensation (Tr. 22).  The ALJ's findings are supported by substantial evidence in the record as a whole, and will be upheld by the Court.

It appears to the Court that Plaintiff's true disagreement with the ALJ is not with the ALJ's analysis, but the ALJ's conclusion that the "claimant does not suffer from a mental disorder of at least two years' duration that has caused more than minimal limitation of ability to do basic work activity with symptoms or signs currently attenuated by medication or psycho social support and one of the following:  (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase of metal demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability

to function outside of a highly supportive living arrangement." (Tr. 22)  Contrary to Plaintiff's

claim that the ALJ's "attempt to explain his assessment appears to rely largely on his finding that

the Plaintiff is very active[,]" the ALJ also based his assessment on the following evidence of

record:  In March 2002, Dr. Grate administered a mini-mental status exam, on which Plaintiff

scored 30 out of 30, indicating normal cognitive functioning (Tr. 210-11) (Tr. 22); Plaintiff's

medical records (Tr. 22-24); Plaintiff's inconsistencies in her reported limitations (Tr. 24);

Plaintiff's statements regarding her daily activities (Tr. 24); the opinions of state agency

physicians[16] and of Dr. Lal (Tr. 24); the various written statements made by Dr. Grate (Tr. 24-

25),[17] and evidence showing that she had only mild limitations on her activities of daily living,

social functioning, and concentration, persistence, and pace, and no episodes of decompensation.

Plaintiff testified at the hearing that she did not think she had problems getting along with other

people (Tr. 387).  She also testified that she cooked for herself, swept her floor two to three

times per week, made her bed, grocery shopped, drove a car, went to church twice a month, went

---

[16]    On April 27, 2002, Karen Scott, Psy.D., a State agency psychologist, reviewed the medical evidence, and found that Plaintiff's depression resulted in no more than mild limitations on her activities of daily living, social functioning, and concentration, persistence, and pace.  She also found that Plaintiff had not experienced any episodes of decompensation.  She therefore concluded that Plaintiff's mental impairment was not severe (Tr. 267-80).

[17]    In March 2001, Dr. Grate stated that Plaintiff could not lift or carry more than 10 lbs. and was unable to do all the duties of her present job as a manufacturing technician (Tr. 161-162), but, Plaintiff could return to "alternate work" not requiring any lifting of more than ten pounds (Tr. 168-72).  Three months later, on June 25, 2001, Dr. Grate's treatment notes reflected that Plaintiff had full shoulder ranges of motion, 5/5 deltoid strength, and 5/5 wrist extension (Tr. 221).  In October 2001, Dr. Grate again found that Plaintiff had full shoulder ranges of motion and normal strength (Tr. 218).  A month later, a physical examination by Dr. Grate was normal (Tr. 216-17).  In September 2002, Dr. Grate found that Plaintiff had full ranges of motion in her shoulders and normal upper extremity reflexes (Tr. 207, 341).  In August 2003, Dr. Grate encouraged Plaintiff to seek employment (Tr. 200).  Two months later, she found that Plaintiff had full left upper extremity ranges of motion, stability, strength, and tone (Tr. 195, 197-98), and in March 2006, found that she had normal neurological functioning, and full strength and normal reflexes in all of her extremities (Tr. 316-17).

to Bible study when someone could pick her up, and went to church choir practice once or twice per month (Tr. 387-91). The ALJ's finding that Plaintiff's mental impairments were not severe is well-supported by the evidence of record.

### 4.     The ALJ failed to correctly assess the Plaintiff's credibility.

Plaintiff argues that the ALJ "failed to make a specific credibility finding" (Pl.'s Br. 28-30). This is not correct. The ALJ specifically found in his decision that Plaintiff's subjective complaints were "not credible" (Tr. 20). The ALJ properly considered the credibility of Plaintiff's subjective complaints in determining the functional effects of her symptoms. SSR 96-7p, 20 CFR 404.1529(b) and 416.929(b). "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively*, 739 F.2d at 989 (citation omitted).

The ALJ considered Plaintiff's numerous subjective complaints in evaluating her credibility (Tr. 19) and properly found that those complaints were inconsistent with the objective medical evidence (Tr. 20). The findings of Drs. Grate, Epstein, and Lal, as well as several imaging studies in the record discussed above, did not indicate the degree of physical symptomology that Plaintiff alleged (Tr. 168-72–While Plaintiff could not perform her current job, she could perform "alternate work" with her employer that did not require lifting of more than ten pounds; 173-74–Plaintiff had normal bicipital and brachioradialis reflexes, only "minimally depressed" triceps reflexes, full muscle strength, and intact sensation. Radiographs indicated "mild" spinal stenosis and Plaintiff could work in a job with "less strenuous activities"; 197-98–She had full left upper extremity ranges of motion, stability, strength, and tone; 207–She

had full shoulder ranges of motion and normal upper extremity reflexes; 208–Plaintiff's bunions

were not significant enough to warrant surgery; 210-11–GERD was under control and she only

had "mild" low back pain and no edema; 216-17–A physical examination was normal; 218–She

had full shoulder ranges of motion and normal strength; 221–She had full shoulder ranges of

motion, deltoid strength, and wrist extension; 224-25–Cervical MRI showed "mild" disc bulging

at C4-5 with "significant" stenosis at C5-6; 238–Sinus CT scan was normal; 316-17–She had

normal neurological functioning, and full strength and normal reflexes in all of her extremities;

338–Abdominal CT scan was normal; 339–Upper GI study was grossly unremarkable;

347-48–She had no motor deficits except for "mild" triceps weakness on the right, normal

reflexes, and no upper motor neuron signs). Likewise, the findings of these physicians did not

indicate the degree of mental symptomology that Plaintiff alleged (Tr. 197-98–Her depression

was "stable"; 200–She had good eye contact and was upbeat; 210-11–Plaintiff got 30 out of 30

on a mini-mental examination and had improved depression; 318–Her depression was improved;

334- 35–She had "stable" depression). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir.

2005) (ALJ can reject a claimant's testimony when it is inconsistent with the objective medical

evidence); 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p.

   The evidence also showed that Plaintiff's impairments improved with medications and

other treatment.  In June 2002 and March 2005, Dr. Grate described Plaintiff's GERD as "under

control" (Tr. 210, 334-35, 342-43). In December 2002, Dr. Bogan noted that Plaintiff's sleep

apnea was improved with the use of her CPAP machine (Tr. 182).  In June 2002, Plaintiff

reported to Dr. Grate that her depression was improved and her appetite was good (Tr. 210,

342-43). In August 2003, Dr. Grate found that Plaintiff had good eye contact and was "upbeat" (Tr. 200). In November 2003 and March 2005, she diagnosed "stable" depression (Tr. 195, 197-98, 334-35), and in December 2005, described Plaintiff's depression as "improved" (Tr. 318). If a symptom can be reasonably controlled with medications or other treatment, it is not disabling. *See Gross*, 785 F.2d at 1166. As the ALJ also found and as discussed above (Tr. 21), Plaintiff's sole treatment for depression was anti-depressant medication prescribed by Dr. Grate (Tr. 207, 210, 213-14, 227-36, 341-43, 345-46). *See Gross*.

Plaintiff's daily activities also undermined her allegations that her subjective symptoms were so severe as to be disabling. She testified that she cooked for herself and swept her floor twice a week, made her bed, grocery shopped, drove a car, went to church twice a month, went to Bible study, and went to church choir practice once or twice per month (Tr. 389-91). Plaintiff reported that, prior to separating from her husband, they shared in doing the ironing, dishes, and mopping (Tr. 148-51). The record also showed that, following her alleged onset date, she looked for work (Tr. 200, 326-27). While not alone determinative, the ALJ considered evidence of Plaintiff's daily activities with the evidence of record as a whole, which supported his conclusion that Plaintiff's limitations were not as severe as she alleged (Tr. 24). *See Johnson*, 434 F.3d at 658 (accepting ALJ's finding that claimant's activities were inconsistent with complaints of incapacitating pain where she attended church, read, watched television, cleaned house, washed clothes, visited relatives, fed pets, cooked, managed finances, and performed stretching exercises; *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) ("The only fair manner to weigh a subjective complaint is to examine how the pain affects the routine of life"); *Gross*, 785 F.2d at

1166 (affirming finding of no disability where claimant managed his household, grocery shopped, cooked, washed dishes, and walked to town each day).

Other inconsistencies also reduced Plaintiff's credibility as a witness. While Plaintiff reported that she had difficulty communicating with and being around others (Tr. 134-37, 318), she testified at the hearing that she had no difficulties getting along with people (Tr. 387). She indicated in a questionnaire in November 2002 that her medications caused drowsiness (Tr. 148), but in December 2005 reported no complications from her medications (Tr. 318). While she reported that she needed help with zippers and buttons (Tr. 145), she testified that she could tie her shoes and button her clothes (Tr. 385-86). While she told Dr. Grate that she had to adjust her seating after driving for more than an hour, she later reported that she could only drive for short distances (Tr. 134-37, 145). *See, e.g., Mickles*, 29 F.3d at 921 (inconsistencies supported a finding that Plaintiff's testimony was not credible).

Plaintiff also argues that the ALJ failed to follow the two-step process for evaluating pain under established Fourth Circuit precedent (Pl.'s Br. 30-31).[18] This is not so. The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to produce [her] alleged symptoms" (Tr. 20). The ALJ then considered the extent to which the objective evidence supported Plaintiff's subjective complaints, the improvement in her symptoms with medications and other treatment, her lack of mental health treatment for her allegedly disabling depression, her daily activities, and numerous other inconsistencies in evaluating her credibility

---

[18]    "The determination of whether a person is disabled by pain or other symptoms is a two-step process." *See Craig*, 76 F.3d at 594. First, a threshold determination is made as to whether objective medical evidence shows the existence of a medical impairment that could reasonably be expected to produce the pain alleged. *Id.*

(Tr. 19-20, 23-24). There is absolutely no merit to Plaintiff's contention that the ALJ did not consider all of the relevant factors used to make a credibility determination (Pl.'s Br. 31-32), such as her daily activities, the duration, frequency, and intensity of her pain, the factors that precipitated or aggravated her symptoms, the type, dosage, and effectiveness of her medications, etc.

After properly considering all of the evidence, the ALJ properly evaluated Plaintiff's residual functional capacity. Residual functional capacity "is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p. In so doing, he considered treating physician Dr. Grate's March 2001 statement that Plaintiff could return to "alternate work" (Tr. 19-22, 24-25, 168-72). He also considered the March 2001 MRI of Plaintiff's cervical spine (Tr. 19-22, 24-25, 224-25). He considered Dr. Grate's treatment notes (Tr. 19-22, 24-25), which included May 2001 findings that she had full shoulder ranges of motion, deltoid strength, and wrist extension (Tr. 221). Five months later, Dr. Grate again found that Plaintiff had full shoulder ranges of motion and normal strength (Tr. 218). A November 2001 physical examination by Dr. Grate was normal (Tr. 216-17). In February 2002, Dr. Grate administered a mini-mental exam on which Plaintiff got 30 out of 30 (Tr. 210-11). Notes from Dr. Grate's clinic in June 2002 indicated that Plaintiff's depression was improved, her GERD was under control, she had only "mild" low back pain and no edema (Tr. 210, 342-43). That same month, Dr. Grate noted that Plaintiff not require surgery for her bunions (Tr. 208). In

September 2002, Dr. Grate found that she had full shoulder ranges of motion, and normal upper extremity reflexes (Tr. 207, 341). In August 2003, Dr. Grate noted that Plaintiff had good eye contact and was upbeat, was looking for a job, and Dr. Grate encouraged her in her job-seeking (Tr. 200). Dr. Grate found that Plaintiff had full left upper extremity ranges of motion, stability, strength, and tone in November 2003 and described her depression as "stable" (Tr. 195, 197-98). An upper GI study in October 2005 was "grossly unremarkable" (Tr. 339). Dr. Grate found "improved" depression" in December 2005 (Tr. 318), and an abdominal CT scan was normal (Tr. 338). Three months later, Dr. Grate found that Plaintiff had normal neurological functioning and full strength and normal reflexes in all her extremities (Tr. 316-17).

The ALJ also considered the findings of examining physician Dr. Epstein (Tr. 19-22, 24-25), who found normal bicipital and brachioradialis reflexes, only "minimally depressed" triceps reflexes, full muscle strength, and intact sensation. Dr. Epstein also noted that Plaintiff's cervical spine MRI showed only "moderate" disc bulging and "mild" spinal stenosis and said that she "would be best served with a position at work that would require less strenuous activities" (Tr. 173-74). He further considered the findings of examining physician Dr. Lal, who found that Plaintiff had no motor deficits except for some questionable "mild" triceps weakness on the right, normal reflexes, and no upper motor neuron signs (Tr. 347-48). The ALJ also considered the findings of the State agency physicians and psychologists (Tr. 24), who found that Plaintiff could perform a range of medium work and did not have a severe mental impairment (Tr. 259-80, 285-306, 308-15). The ALJ's finding that Plaintiff could perform a range of light work is well-supported by the evidence.

Having properly determined Plaintiff's residual functional capacity, the ALJ then properly found that Plaintiff could perform her past relevant work as a cashier, manufacturing technician, secretary/office assistant, and food service coordinator. A claimant will be found "not disabled" when she retains the residual functional capacity to perform (1) the actual functional demands and job duties of a particular past relevant job; or (2) the functional demands and job duties of the occupation as generally required by employers throughout the national economy. SSR 82-6. The claimant bears the burden of proving her inability to return to her past relevant work. *Id.* The vocational expert testified that Plaintiff's past relevant work as a cashier was semi-skilled and light as it is generally performed; her past relevant work as a manufacturing technician was semi-skilled and light as generally performed and medium as she performed it; her past relevant work was a secretary was skilled and sedentary as she performed it; and her past relevant work as a food service coordinator was skilled and light as generally performed and as she performed it (Tr. 392-94). Plaintiff's residual functional capacity did not preclude her from performing her past relevant jobs as a cashier, manufacturing technician, secretary/office assistant, and food service coordinator, either as generally performed or as she performed them. Thus, substantial evidence supported the ALJ's conclusion that Plaintiff was not disabled because she could perform her past relevant work.

In conclusion, the Commissioner's finding that Plaintiff was not disabled is supported by substantial evidence, and will be upheld by this court. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006).

## **RECOMMENDATION**

Based upon the foregoing, **it is recommended that the Commissioner's decision be affirmed.**

GEORGE C. KOSKO
UNITED STATES MAGISTRATE JUDGE

November 30, 2007

Charleston, South Carolina